**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**ROGER LEE HARRIS,**

      **Plaintiff,**

**v.**                             **Case No.: 2:13-cv-28109**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 14, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for

judgment on the pleadings be **GRANTED,** that the Commissioner's motion for judgment on the pleadings be **DENIED**, that the decision of the Commissioner be **REVERSED,** and that this case be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    <u>Procedural History</u>

In November 2010, Plaintiff Roger Lee Harris ("Claimant") filed applications for SSI and DIB, alleging disability beginning on June 30, 2008 due to "learning disability, right shoulder, lower back, and neck, headaches." (Tr. at 12, 159). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 12). Accordingly, Claimant filed a request for an administrative hearing, which was held on July 12, 2012 before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 30-58). By written decision dated July 27, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-26). The ALJ's decision became the final decision of the Commissioner on September 18, 2013, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10). Claimant filed a motion for judgment on the pleadings, arguing that the ALJ made fundamental errors in her analysis, and requesting that the Court reverse the decision of the Commissioner and award benefits, or in the alternative, vacate the decision and remand the matter for further proceedings. (ECF No. 11, 15). The Commissioner also filed a motion for judgment on the pleadings,

stating that the ALJ properly applied the relevant law and reached a decision that was supported by substantial evidence; thus, the final decision of the Commissioner should be affirmed. (ECF No. 14).

The parties have thoroughly briefed their respective positions. Therefore, this matter is ready for resolution.

## II.    **Claimant's Background**

Claimant was 37 years old on the alleged disability onset date and 42 years old on the date of the ALJ's decision. (Tr. at 24, 37). He quit school at age sixteen, prior to completing the eighth grade, and did not receive his GED or obtain any vocational training thereafter. (Tr. at 37, 225). Claimant communicates in English, although his ability to read and write is so limited that he has been diagnosed as functionally illiterate. (Tr. at 246, 249). Claimant has past relevant work experience as a utility worker/rig worker, and as a carpentry laborer. (Tr. at 23).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a

claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth functional category (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). However, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2).

Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ must assess the claimant's mental residual functional capacity. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the special technique must

be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2011. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 30, 2008, the alleged disability onset date. (Tr. at 14, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "injuries to the back, neck, shoulders, legs; headaches; learning disability; and anxiety disorder." (Tr. at 14-15, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-17, Finding No. 4). The ALJ specifically looked at the listed impairments found under sections 1.02 (Major dysfunction of joints); 1.04 (Disorders of the spine); 11.03 (Nonconvulsive epilepsy); 12.02 (Organic mental disorders); 12.05 (Mental retardation); and 12.06 (Anxiety-related disorders) of the Listing. She then determined Claimant's RFC, finding that Claimant has:

> [T]he residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b). He can lift/carry 20 pounds occasionally and 10 pounds frequently in light work as defined by the Regulations. He can sit 6 hours and stand/walk 6 hours in an 8-hour workday. He can occasionally reach overhead. He should avoid concentrated exposure to noise, vibrations, and hazards including machinery and unprotected heights. He is limited to simple, routine

> repetitive work requiring concentration for up to 2 hour intervals with no written instructions and only superficial interaction with coworkers and supervisors and no interaction with the general public. Such employment should not involve fast-paced production requirements and should be limited to only simple work-related decisions and few, if any, changes in the work environment.

(Tr. at 18-23, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform his past relevant work. (Tr. at 23-24, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 24-25, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1970, and was therefore defined as a younger individual age 18-49; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not an issue because his past relevant work was unskilled. (Tr. at 24, Finding Nos. 7-9). In light of these factors and Claimant's RFC, and relying on the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 24-25, Finding No. 10), including work as an Garment Folder, Product Sorter, and a Hand Packer. (Tr. at 24). Consequently, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 25, Finding No. 11).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant argues that the ALJ's decision is not supported by substantial evidence for two reasons. First, the ALJ erred when she determined that Claimant did not meet section 12.05B of the Listing. (ECF No. 11 at 8). Specifically, Claimant challenges the ALJ's finding that Claimant did not show deficits in adaptive functioning prior to age 22. According to Claimant, the ALJ ignored considerable evidence in the record

demonstrating Claimant's longstanding impairments in virtually every skill area, and instead focused solely on Claimant's prior work history to conclude that he had no early-onset deficits in adaptive functioning. (*Id.* at 11-15).

Second, Claimant contends that the ALJ erred when she assessed Claimant to be capable of occasional overhead reaching despite uncontested medical records corroborating his inability to flex his right shoulder beyond 90 degrees and his left shoulder beyond 120 degrees. (*Id.* at 15). Claimant points out that the AMA *Guide to Evaluation of Permanent Impairment* confirms that similar limitations of flexion effectively prohibit overhead reaching.

In response to Claimant's arguments, the Commissioner asserts that the ALJ did not err when deciding that Claimant failed to meet listing 12.05B given that the I.Q. scores supplied by Claimant to support the listed impairment were considered invalid by the testing psychologist. (ECF No. 14 at 8). Moreover, the ALJ found that Claimant showed no evidence of deficits in adaptive functioning not only based upon his work record, but also his school record and his ability to care for his own daily needs. (*Id.* at 11). Because listing 12.05B requires Claimant to meet the diagnostic description of mental retardation, as well as the severity criteria, his failure to establish deficits in adaptive functioning preclude a finding that he meets the listed impairment.

Regarding the ALJ's RFC assessment, the Commissioner observes that the medical records documenting Claimant's limited shoulder flexion also note that Claimant made only a "fair" effort during the range of motion testing. (*Id.* at 14). Additional experts examined the records and found the flexion limitations to be inconsistent with other medical information and with Claimant's daily activities. Therefore, these experts gave the limitations only partial weight. Similarly, the ALJ

found Claimant to be only partially credible, noting that at least one agency consultant felt his reported limitations were exaggerated. The ALJ remarked that Claimant's activities of daily living, his minimal medical care, and his use of only over-the-counter medications all strongly suggested that Claimant was able to work. According to the Commissioner, substantial evidence supports that point of view. (*Id.* at 15).

## V.    Relevant Medical History

Although the undersigned had reviewed all of the evidence, including all of the medical records, only the most relevant medical information is summarized below.

### A.    *Treatment Records*

The only treatment records in evidence were provided by Charleston Area Medical Center, Inc. ("CAMC") and document an ATV accident suffered by Claimant in August 2007. (Tr. at 273-286). On August 30, 2007, Claimant crashed while driving his ATV. He was not wearing a helmet at the time. Claimant was taken to the Emergency Department at CAMC and was assessed by the trauma team. He was diagnosed with a C2 fracture; right rib fractures; C5 to C7 transverse process fractures; right pneumothorax; near avulsion of the left ear with bilateral cheek wounds; right scapula fracture; and a concussion. (Tr. at 269). He underwent surgical reattachment and reconstruction of his ear, with closure of the cheek wounds, repair of simple forehead lacerations, and intraoperative leech treatment. (*Id.*) In the immediate post-operative period, Claimant was placed in the intensive care unit. He did well during his hospital stay, and was discharged on September 4, 2007 in stable condition. At that time, he was instructed to remain non-weightbearing, keep his right arm in a sling, take pain medications and antibiotics, and follow-up with a surgeon, a neurosurgeon, and a maxillofacial surgeon. (*Id.*)

**B.     Evaluations**

On February 1, 2011, Kara Gettman-Hughes, M.A., performed an adult mental profile of Claimant at the request of the West Virginia Disability Determination Service. (Tr. at 223-228). Ms. Gettman-Hughes conducted a clinical interview and a mental status examination, reviewed the Adult Function Report, and administered the Wechsler Adult Intelligence Scale ("WAIS") and the Wide Range Achievement Test ("WRAT"). She documented that Claimant was accompanied to the examination by his brother and sister-in-law. He reported that he lived with his mother, had no romantic partner, had never been married, and had no children. Claimant indicated that he had applied for benefits due to injuries received in an ATV accident in 2007, which caused chronic pain and functional limitations. (Tr. at 224). As far as historical information, Claimant denied using alcohol or drugs, although he did use about half a can of snuff per day. He told Ms. Gettman-Hughes that he completed the eighth grade in school, but was placed in special education classes and was retained in the first grade. He was last employed in 2008 on a service rig. His work history included other manual labor jobs, which never required him to read or write. He attempted in the past to obtain a driver's license, but was unable to pass the written examination. (Tr. at 225).

On the WAIS, Claimant had a Full Scale IQ of 48; however, Ms. Gettman-Hughes did not deem the score to be valid or representative of Claimant's current level of functioning. She noted that Claimant did not seem to put forth a good effort, remarking that he frequently responded, "I don't know," to test questions, and did not use the allotted amount of time for task completion. (Tr. at 226). Claimant's scores on the WRAT, which measured his reading, spelling, and math skills, hovered at the kindergarten to first grade level, and were likewise deemed invalid for similar reasons.

On mental status examination, Ms. Gettman-Hughes observed that Claimant was slightly disheveled with poor hygiene. He appeared a little anxious, but was cooperative and was not agitated. Claimant's immediate and recent memories were normal, but his remote memory was impaired, as was his concentration and persistence. He also moved at a slow pace. (*Id.*) Ms. Gettman-Hughes diagnosed Claimant with Generalized Anxiety Disorder and Pain Disorder. She indicated that although his current intelligence testing was deemed invalid, a diagnosis of borderline intelligence or even mild mental retardation might be appropriate considering his academic history, work history, and interpersonal skills. (Tr. at 227).

Based upon Ms. Gettman-Hughes's evaluation, agency consultant, G. David Allen, Ph.D., completed a Psychiatric Review Technique on Claimant on February 9, 2011. (Tr. at 231-244). Dr. Allen opined that Claimant had mild limitations in his activities of daily living, social functioning, concentration, persistence, and pace, and had no episodes of decompensation of extended duration. (Tr. at 241). Dr. Allen noted that Claimant was not fully credible given his poor effort at the evaluation and his lack of psychiatric treatment. (Tr. at 243). Dr. Allen's opinions were affirmed on May 14, 2011 by a second consultant, Karl Hursey, Ph.D. (Tr. at 262).

Claimant underwent a physical evaluation by Dr. Rakesh Wahi on February 14, 2011. (Tr. at 246-250). Of particular note, Dr. Wahi observed that Claimant could barely sign his name, was not able to "read much more than that," and had difficulty doing simple math. (Tr. at 246, 249). Claimant advised Dr. Wahi that he had a learning disability and had only advanced to the eighth grade in school. Dr. Wahi diagnosed Claimant with functional illiteracy, as well as multiple joint injuries from the ATV accident and frequent headaches. (Tr. at 249). Dr. Wahi also indicated that Claimant's

traumatic injuries from the vehicle crash left him with the inability to fully raise his arms over his head or to bend. (*Id.*).

On February 18, 2011, Dr. Uma Reddy completed a Physical Residual Functional Capacity Assessment. (Tr. at 253-260). She determined that Claimant could lift and carry as much as 25 pounds frequently and 50 pounds occasionally, and could sit, stand, and walk about six hours each in an 8-hour workday. (Tr. at 254). She did not feel that Claimant had any postural, manipulative, visual, or communicative limitations, but opined that he should avoid concentrated exposure to noise, vibrations, and hazards like machinery and heights. (Tr. at 255-57). Dr. Reddy disagreed with the degree of limitation described by Dr. Wahi on the basis that it was "non-specific." (Tr. at 259). Dr. Reddy's opinion was affirmed on May 16, 2011 by a second agency consultant, Dr. Fulvio Franyutti. (Tr. at 264).

On June 5 and June 19, 2012, Claimant was evaluated by Laura Bickett, Ph.D., a licensed psychologist practicing at Psych Services of Roane County, Inc. (Tr. at 287-297). According to the report prepared by Dr. Bickett, Claimant was referred for the evaluation by his attorney "in order to assist in the determination of mental health needs and capacity to benefit from mental health treatment." (Tr. at 287). Dr. Bickett interviewed Claimant, administered various tests, and also interviewed Claimant's brother for collateral information.

Dr. Bickett noted that Claimant generally denied having psychological difficulties. (Tr. at 288). He described himself as being quiet and preferred to be at home rather than in social settings, but his mood was usually good. Claimant had no history of mental health treatment. Dr. Bickett reviewed Claimant's evaluations by Ms. Gettman-Hughes and Dr. Wahi, and independently took Claimant's medical history. (*Id.*)

Claimant reported that he did not have a family doctor and had no medical insurance. He described suffering some major injuries in the ATV accident and indicated that he continued to experience chronic pain and limitation from those injuries.

Claimant also provided Dr. Bickett with a summary of his educational history. (Tr. at 289). He stated that he quit school when he was 16 years old after finishing the seventh grade. He reported having been held back at least one grade and admitted being placed in special education classes for all subjects throughout his time in school. Claimant told Dr. Bickett that he had attempted to get his driver's license on three occasions, but failed the written test each time. He became discouraged and gave up. As to his social history, Claimant reported that he lived with his mother. He had never married and had no children. (Tr. at 289). He helped his mother by performing light housework, and he was able to go to the store and pay cash for items. However, he relied on others to help him fill out money orders to pay bills, and he had never had a checking or savings account. (Tr. at 290).

Claimant's brother, Phillip, confirmed in his interview that Claimant had experienced learning difficulties his entire life and was also extremely shy. Phillip stated that Claimant had encountered many problems with employment, as well, estimating that Claimant had been laid off 15 or 20 times due to his inability to do the job, or his illiteracy, or his inability to drive. As an example, Phillip described having to have someone shadow Claimant at a carpentry job to remind him what to do, or "otherwise he'd wander off." (*Id.*) According to Phillip, Claimant was capable of attending to his own basic needs, but Phillip and his wife had to assist Claimant with transportation, grocery shopping, scheduling appointments, caring for his mother, and money management. Since the ATV accident, Phillip remarked that Claimant had exhibited

difficulty sleeping and seemed depressed.

Dr. Bickett observed Claimant to be cooperative during the mental status evaluation, although he had difficulty providing details for personal history and required prompting to elaborate. She noted that Claimant exhibited facial flushing when he was unable to answer questions, and he was anxious. Dr. Bickett found Claimant's immediate memory to be normal but both his delayed and remote memories were markedly deficient. (Tr. at 291). She felt his social functioning was moderately impaired by his hesitant communications and anxiety. His persistence was normal, but his pace was deficient, as demonstrated by his slow and halting communications.

Dr. Bickett administered the Beck Depression Inventory, which revealed some mild to moderate symptoms of depression. The Beck Anxiety Inventory reflected only a mild level of anxiety with some attendant symptoms. (Tr. at 291). On intelligence testing, Claimant had a verbal comprehension score of 58, a perceptual reasoning score of 63, a working memory score of 66, and a processing speed score of 62. His full scale I.Q. was 56, which Dr. Bickett believed was an accurate indicator of his intelligence. (Tr. at 292). She commented that Claimant occasionally responded that he did not know answers to various questions posed to him, as he had to Ms. Gettman-Hughes; however, unlike Ms. Gettman-Hughes, who felt that Claimant was simply not trying, Dr. Bickett believed that Claimant was being truthful when he provided those answers. Dr. Bickett also pointed out that the I.Q. score she obtained was 8 points higher than the score documented by Ms. Gettman-Hughes, and attributed the difference to both greater persistence by Claimant and slight practice effects as this was his second time taking the test. (*Id.*). The results of Claimant's WRAT were identical to the results obtained by Ms. Gettman-Hughes, confirming that Claimant's academic skill levels in reading, spelling,

and math remained around the kindergarten to first grade level.

In summary, Dr. Bickett opined that Claimant had significant cognitive and academic deficits in addition to ongoing physical limitations related to his ATV accident. She concluded that his I.Q. results placed him in the mild range of mental limitation with adaptive skill deficits in the areas of work, communication, money management, community navigation, and self-direction. Dr. Bickett suspected that Claimant also suffered from social phobia, although she did not feel there was sufficient data to make the diagnosis at that time. She opined that his prognosis was poor given the number and degree of his deficits, and she felt Claimant's ability to benefit from therapy was compromised by his cognitive limitations and entrenched pattern of social avoidance. (Tr. at 293).

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. Thus, the decision for the Court to make is "not whether the

claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.** **Discussion**

    **A.** ***Listing 12.05B***

    In the instant case, Claimant argues that the ALJ erred at step three of the sequential evaluation process when she failed to find Claimant disabled under listing 12.05B. A claimant should be found disabled at step three of the process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

    Section 12.00 of the Listing pertains to Mental Disorders, which are arranged in

16

nine diagnostic categories, including listing 12.05 (Mental Retardation). 20 C.F.R. Pt.

404, Subpt. P, App'x 1 § 12.00. According to the regulations:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.[1]

*Id.* Thus, to qualify for disability under listing 12.05B, Claimant must establish that he

has an intellectual impairment that satisfies both the *diagnostic description* of mental

retardation and the set of *severity criteria* outlined in paragraph B. The diagnostic

description of mental retardation, sometimes called the first prong of the listing, is

"significantly subaverage general intellectual functioning with deficits in adaptive

functioning initially manifested during the developmental period, i.e., the evidence

demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404,

Subpart P, App'x 1 § 12.05. The set of severity criteria contained in paragraph B, which

constitutes the second prong of listing 12.05B, is: "A valid verbal, performance, or full

scale IQ of 59 or less." *Id.*

At step three of the sequential process, the ALJ correctly considered whether

Claimant met listing 12.05B. (Tr. at 17). Looking first at the severity criteria, the ALJ

determined that Claimant satisfied paragraph B with evidence of a full scale IQ of 56.[2]

Nevertheless, the ALJ determined that Claimant did not meet listing 12.05B because

---

[1] The term "mental retardation" was replaced with "intellectual disability" effective September 3, 2013. 78 Fed.Reg. 46,499–46,501 (Aug. 1, 2013). This change "does not affect the actual medical definition of the disorder or available programs or service," *Id.* at 46,500. The structure of the listing, its diagnostic description, and its severity criteria are also unchanged.

[2] Contrary to the Commissioner's argument that the ALJ did not accept Dr. Bickett's I.Q. score of 56 as a valid measurement of Claimant's intellectual functioning, the ALJ conceded in her written opinion that Claimant's Full Scale I.Q. score of 56 did satisfy the I.Q. score requirement of paragraph B. (Tr. at 17).

"the record does not establish deficits in adaptive functioning before age 22." (*Id.*). Put simply, the ALJ found that while Claimant could prove the second prong of the listing, he could not prove the first prong. Pointing to Claimant's "successful" work history, the ALJ concluded that Claimant's past ability to work proved that he did not have the level of intellectual dysfunction and other mental deficits that precluded work. As the ALJ explained, Claimant had:

> engaged in substantial gainful activity at unskilled jobs without any significant accommodations by his employers ... the fact the claimant's learning disability did not prevent him from working at substantial gainful activity levels in the past strongly suggests that it would not currently prevent work. In fact, as noted, the claimant testified he was unable to work due to pain.

(Tr. at 17, 22). The ALJ added without further explanation that the "[t]he deficits in adaptive functioning needed to establish mental retardation are simply not present." (Tr. at 17). Having carefully reviewed the record, the undersigned **FINDS** that the ALJ erred in her analysis of Claimant's deficits in adaptive functioning.

As previously stated, intrinsic to the diagnostic description of mental retardation is evidence of early-onset (pre-age 22) deficits in adaptive functioning. Adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM–IV-TR[3] at 40. Skill areas of adaptive functioning include "communication, self-care,

---

[3] Diagnostic and Statistical Manual of Mental Disorders, American Psychiatric Association, 4th ed., Text Revision, 2000 ("DSM–IV–TR"). The SSA recognizes four major professional organizations that each has its own definition of mental retardation. All four definitions include significant deficits in adaptive functioning as an element of the condition although the organizations differ in the required date of onset and the method of measurement. *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed.Reg. 20,018–01, at 20,022 (Apr. 24, 2002). The American Psychiatric Association's definition, while not specifically adopted by the SSA, is generally accepted and recognized in the field of mental health.

home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.* at 39. To determine whether a claimant demonstrates deficits in adaptive functioning that manifested during the developmental period, the ALJ must perform a fact-specific inquiry. Although this inquiry has "few bright line rules," courts in this circuit have pointed to multiple factors that tend to establish the presence of deficits in adaptive functioning with an early onset. *See Weedon v. Astrue,* Case No. 0:11–2971–DCN–PJG 2013 WL 1315311, at *5 (D.S.C. Jan. 31, 2013) (collecting cases). For example, if a claimant has previously been diagnosed with mental retardation, courts are inclined to find that the claimant had an earlier onset of deficits in adaptive functioning. *Conyers v. Astrue,* No. 4:11–CV–00037–D, 2012 WL 3282329, at *8-9 (E.D.N.C. June 29, 2012). In addition, evidence of a claimant's illiteracy, *Rivers v. Astrue,* No. 8:10–cv–314–RMG, 2011 WL 2581447, at *4 (D.S.C. June 28, 2011); evidence that a claimant has never lived independently, *Holtsclaw v. Astrue,* No. 1:10CV199, 2011 WL 6935499, at *5 (W.D.N.C.Dec.30, 2011); and evidence that a claimant is dependent on others, or has never been responsible to care for others, *Salmons v. Astrue,* No. 5:10-CV-195–RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23, 2012), have all been considered proof of deficits in adaptive functioning that manifested before age 22.

Another well-recognized indicator of limitations in adaptive functioning manifesting in the developmental years is poor academic performance. *Smith v. Astrue,* 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011); *Salmons v. Astrue,* 5:10-cv-195-RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23. 2012) ("[F]unctional academic skill is the primary measure of deficits in adaptive functioning before age 22.") Accordingly, school records showing ongoing problems in the classroom are important evidence of

early-onset deficiencies in functioning that should not be undervalued when assessing the first prong of listing 12.05B. Work history is also a factor to consider, as absent or unstable job performance may indicate deficits in adaptive functioning; although, the existence of a stable work history, by itself, is not determinative of the inquiry. *See Salmons,* 2012 WL 1884485, at *2-3 (citing *Luckey v. U.S. Dep't of Health & Human Servs.,* 890 F.2d 666, 669 (4th Cir. 1989)).

In this case, the ALJ made several errors in her review and discussion of the evidence. First, she placed too much emphasis on her perception that Claimant had a "successful" work history; particularly, when that perception appears to be inaccurate. Second, she either overlooked, or simply failed to mention parts of the record that were highly probative of whether Claimant had deficits in adaptive functioning that manifested during the developmental period. Either way, the absence of probative information in the analysis is concerning. Finally, the ALJ failed to address, weigh, and reconcile conflicting evidence. An ALJ "need not discuss every shred of evidence included in the record," *Frasier v. Colvin,* No. 9:12–cv–01947–DCN, 2014 WL 526400, at *3 (D.S.C. Feb. 10, 2014), but should "explicitly indicate[ ] the weight given to all of the relevant evidence." *Gordon v. Schweiker,* 725 F.2d 231, 235 (4th Cir. 1984). The ALJ's discussion should be sufficient to accomplish two things; one, to assure the reviewing court that the important evidence was considered, and, two, to allow the court to understand the reasoning that supports the ALJ's decision. *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985).  The ALJ accomplished neither goal here.

The ALJ stated in her written opinion that Claimant "successfully" engaged in gainful activity "without accommodation." (Tr. at 17). Considering that the ALJ largely based her step three finding on this fact, its accuracy is essential to the validity of the

finding. Yet, the ALJ failed to cite any evidentiary support for that assertion. Indeed, the evidence of record suggests the contrary. During the hearing, no questions were asked of Claimant regarding employment accommodations. However, when the vocational expert testified about Claimant's most recent job as a well rigger, the expert described Claimant's duties as "unusual," explaining that they did not match the "more complex" duties normally required of a well servicer, the DOT position most closely aligned to the well rigger job performed by Claimant. (Tr. at 54). The vocational expert added that "it sounds like [the well rigger job] was a job that was designed for [Claimant] primarily by a friend or an acquaintance or a relative." (Tr. at 52). Thus, although the vocational expert did not use the word "accommodation," the concept was certainly implied.

In addition, in the record of Claimant's psychological examination by Ms. Gettman-Hughes, it is clearly noted that Claimant could only work at jobs that required no reading, writing, or driving. (Tr. at 225). Undoubtedly, Claimant's illiteracy and inability to pass the driver's license examination had required at least some accommodation on the part of his prior employers. Then again, probably the most telling evidence regarding Claimant's work history is Dr. Bickett's summary of her interview of Phillip Harris, Claimant's brother. (Tr. at 290). According to Dr. Bickett's report, Phillip stated that Claimant had experienced significant and ongoing difficulties with employment over the years, and had probably been laid off from 15 to 20 jobs because "he couldn't follow what to do and he couldn't read and he couldn't get a driver's license." (*Id.*) Phillip reported numerous unsuccessful attempts by Claimant to work in the oil fields and at strip mines. Phillip recalled that he and Claimant worked together for a while as carpenter's assistants, and Claimant "had to have someone with him to shadow him and help him remember what to do and how to do it otherwise he'd

wander off." (*Id.*). Accordingly, substantial evidence of record undermines, rather than supports, the ALJ's primary reason for finding that Claimant lacked the requisite deficits in adaptive functioning to meet the definition of mental retardation. Yet, the ALJ never addressed nor reconciled any of this important evidence.

Despite the significance of academic performance to the inquiry of adaptive functioning, the ALJ's review of Claimant's school record was similarly superficial and ignored evidence contradictory to her conclusion. As an example, the ALJ emphasized that Claimant made average to above average grades in key courses in the seventh grade. (Tr. at 21). She added that although Claimant made poor grades in eighth grade, he had 101 absences and dropped out before completing the year. She stated that it was noteworthy that he had a "B" average in Reading during the first semester of the eighth grade. (*Id.*). The ALJ's interpretation of the school record paints a rosier picture than the record itself. In fact, the record shows that Claimant was in the seventh grade from 1984 to 1985. (Tr. at 211). Therefore, he was fourteen years old when most students in the seventh grade are twelve or thirteen, which is consistent with his testimony that he was held back one year in elementary school. While the ALJ correctly stated that Claimant received average grades in his core classes, she failed to mention that he was in special education classes. The following year, Claimant received mainly failing or near failing grades, with the exception of a "B" in reading the first semester. (*Id.*) Claimant missed 101 days, and he did not pass the eighth grade. According to the record, he remained in the eighth grade the following school year when he withdrew from school in October 1986. (*Id.*) Therefore, at the time Claimant quit school at age sixteen, he was in a grade normally populated by thirteen and fourteen year olds (and was in that grade for the second time).

Next, the ALJ's discussion of the evaluation by examining psychologist, Ms. Gettman-Hughes, omitted observations and assessments generally considered significant to analyzing the presence and duration of deficits in adaptive functioning. The ALJ reviewed Ms. Gettman-Hughes's summary of Claimant's educational difficulties, including that he was retained in the first grade, was placed in special education classes, and only went up to the eighth grade in school. (Tr. at 21). In addition, Claimant scored very low on his intelligence testing (a Full Scale I.Q. of 48), and almost as low on wide range achievement testing, with functional scores at the kindergarten and first grade level. The ALJ stressed that Ms. Gettman-Hughes did not believe these scores were valid and thus deferred an Axis II diagnosis, although she opined that Claimant was capable of managing benefits. (*Id.*)  However, the ALJ plainly failed to acknowledge that despite Ms. Gettman-Hughes's deferral of an Axis II diagnosis, she affirmatively opined "[a]lthough current test results are deemed to be invalid, a diagnosis of borderline intellectual functioning ***or even a mild mental retardation*** may be appropriate based on the claimant's academic history, work history, and interpersonal skills, including broad range of knowledge and vocabulary." (emphasis added) (Tr. at 227).

In addition, the ALJ overlooked other notable documentation by Ms. Gettman-Hughes. For instance, Ms. Gettman-Hughes found Claimant to be slightly disheveled, with poor hygiene, moderately impaired in social functioning, with poor concentration, slow pace, and mildly impaired persistence. (Tr. at 226). Also of significance, Ms. Gettman-Hughes noted that Claimant, a forty-year-old man, lived with his mother, had never been married, and was accompanied by his brother and sister-in-law to the appointment. Although Claimant worked at various labor positions in the past, the jobs

never required Claimant to read or write, and Claimant was unable to state his longest period of employment. (Tr. at 225). Claimant was unable to drive, because he could not pass the driver's license test. Clearly, these findings suggested deficits in adaptive functioning that *may be* consistent with a diagnosis of mild mental retardation, yet the ALJ did not recognize, discuss, or weigh these findings.

When the ALJ reviewed the examination and findings of psychologist, Dr. Bickett, the ALJ once again included only those portions of the report that supported her finding that Claimant was independent in daily activities and fully capable of working. (Tr. at 21-22). The ALJ conceded Claimant's low I.Q. scores (Full Scale score of 56), and his wide range achievement test scores showing for a second time functional levels at the kindergarten and first grade level, but did not appreciate or comment on the consistency of the achievement scores, which were precisely the same as those returned by Ms. Gettman-Hughes. Ultimately, the ALJ gave little weight to Dr. Bickett's opinions in part on the grounds that she was a one-time examining/non-treating source, retained specifically to provide opinions for the Claimant's disability appeal. (Tr. at 23).

Of significance, the ALJ once more disregarded observations and findings made by an accepted medical source that were highly relevant to an assessment of whether Claimant had deficits in adaptive functioning that manifested in the developmental period. For example, for the first time, the record clarified that Claimant failed the driver's license examination **three times** before becoming discouraged and giving up. (Tr. at 289). In addition, Claimant was painfully shy, refused to speak in school, and was in special education classes his entire educational career and for all subjects. (*Id.*) Claimant lived with his mother most of his live except for a brief period of time when he lived with a girlfriend; therefore, he had never really lived independently. (*Id.*).

24

Claimant could not verbalize why his romantic relationship ended, and had not dated any one since that relationship terminated. Dr. Bickett documented that Claimant had never had a checking or savings account despite being in his forties. He had learned how to use food stamps and cash to buy items in the store, but relied on others to fill out money orders to pay bills. (Tr. at 290). He relied heavily on his brother and sister-in-law to help with money management, scheduling appointments, caring for him and his mother, and with transportation and grocery shopping. (*Id.*)

The ALJ similarly rejected Dr. Bickett's final assessment and Mental Residual Functional Capacity Assessment, which entirely conflicted with the ALJ's decision, stating that she gave it little weight as a one-time evaluation that was inconsistent with treatment history, work history, and Claimant's "rather full" activities of daily living. (Tr. at 23). Dr. Bickett found Claimant to have lifelong cognitive and academic deficits, with adaptive skill deficits in the areas of work, communication, money management, community navigation, and self-direction. She also found Claimant to have moderate to marked deficits in all areas assessed, including abstract thinking, nonverbal reasoning, short-term memory, concentration, word knowledge, general fund of information, visual motor coordination, and speed. (Tr. at 292). Dr. Bickett noted that although Claimant had made great effort to work, the available information suggested that "he has had great difficulty sustaining steady employment due at least in part to cognitive limitations and has relied on others throughout his life to assist him with activities of daily living, notably those requiring interactions in work, public and community settings." (Tr. at 292-93).

In addition to the ALJ's inadequate treatment of the relevant evidence, the ALJ's finding that Claimant lacked deficits in adaptive functioning sufficient to meet the

diagnostic description of mental retardation is not supported by substantial evidence because it is inconsistent with other findings made by the ALJ. When evaluating whether Claimant's intellectual disability was a severe impairment at step two of the disability process, the ALJ rated the severity of limitation experienced by Claimant in the four areas of adaptive functioning contained in the paragraph D criteria of listing 12.05, including activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation of extended duration. The ALJ found Claimant to have moderate limitations in social functioning and in concentration, persistence and pace. (Tr. at 16). Listing 12.05's diagnostic description "does not specify what degree of deficit is required (mild versus significant, for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." *Blancas v. Astrue,* 690 F.Supp.2d 464, 477 (W.D.Tex. 2010). However, because a claimant must also show deficits in adaptive functioning to qualify under "other alternative listings within the broader Mental Retardation Listing, i.e., Listings 12.05A, 12.05B, and 12.05D, 'the deficits necessary to satisfy [Prong 1] would appear to be less than the [Prong 3] criteria of Listing 12.05D, which requires 'marked' restriction of activities of daily living and social functioning.'" *Nelson v. Astrue,* 1:09-cv-117, 2012 WL 373364, at *5 (M.D.N.C. Feb. 3, 2012) (quoting *Blancas,* 690 F.Supp.2d at 477). "Any other interpretation might reduce Prong 3 of Listing 12.05D to a nullity, something courts must avoid." *Id.* As a result, a finding of moderate deficits in adaptive functioning in the paragraph D criteria would arguably satisfy the diagnostic description. *Linaberg v. Com. of Social Sec.,* Case No. 1:13-cv-177, 2014 WL 3101449, at *n. 9 (N.D.W.Va. July 7, 2014). The ALJ neither addressed, nor reconciled, the inconsistency between her two "moderate" findings in the

paragraph D criteria and her finding that Claimant did not have the requisite deficits in adaptive functioning. *Nelson,* 2012 WL 373364, at *7.

Consequently, taking the evidence as a whole, the ALJ's written decision cannot withstand scrutiny. Her findings of moderate limitations in two categories of adaptive functioning, by themselves, tend to negate her unsupported statement that "the deficits in adaptive functioning needed to establish mental retardation are simply not present." This is especially true considering that the deficits identified in the functional categories appear to be long-standing in nature. *See Nelson,* 2012 WL 373364, at *5; *Hager v. Astrue,* Case No. 2:09–cv–01357, 2011 WL 1299509, at *3 (S.D.W.Va. Mar. 31, 2011); *Linaberg,* 2014 WL 3101449, at *n. 9 ("A finding of at least moderate limitations of functioning has been held to be facially in tension with the ALJ's conclusion that a claimant lacks deficits in adaptive functioning"). In addition, Claimant clearly had deficits in functional academics from a young age, prompting his placement in special education classes. Furthermore, the ALJ specifically noted that Claimant was diagnosed by Dr. Wahi as functionally illiterate, a finding that is patently inconsistent with her statement that Claimant had no adaptive deficits consistent with a diagnosis of mental retardation. The ALJ failed to adequately address other significant evidence of early-onset deficits in adaptive functioning, including Claimant's dependence on his brother and sister-in-law for money management, health care, and transportation; his dependence on his sister-in-law to fill out the Social Security Disability forms; his inability to pass the driver's license test despite taking the written version three times and the oral version once; his withdrawal from school in the eighth grade at age 16; his difficulty getting and keeping jobs; his lifelong residence with his mother; and his limited associations with others.

Under the circumstances, the ALJ's decision is not supported by substantial evidence for the simple reason that the ALJ has failed to consider, weigh, and reconcile all of the relevant evidence. *Gordon,* 725 F.2d at 235 ("We cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.") The Court should therefore remand this case for further proceedings to determine whether Claimant has met the diagnostic description of mental retardation contained in the first prong of listing 12.05B.

### B.    *RFC Findings*

Claimant also challenges the ALJ's finding that Claimant is capable of performing light work with occasional overhead reaching. In particular, Claimant contends that the only pertinent medical evidence in the record is Dr. Wahi's examination, which confirms that Claimant is unable to fully raise his arms over his head. (ECF No. 11 at 15-16). Indeed, when examining the range of motion measurements recorded by Dr. Wahi in his report, the documentation substantiates that Claimant is physically incapable of reaching overhead. (*Id.* at 17). According to Claimant, the ALJ rejected Dr. Wahi's findings without providing any explanation in violation of Social Security Ruling 96-6p.

Social Security Ruling 96-6p provides that state agency medical consultants are "highly qualified physicians ... who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96-6p, 1996 WL 374180 at *2; *see also* 20 C.F.R. §§ 404.1527(f)(2)(i) & 416.927(f)(2)(i). Accordingly, the ALJ is required "to consider their findings of fact about the nature and severity of an individual's impairments" *Id.* at *2. In doing so, the ALJ must consider "the consultant's medical specialty and expertise ..., the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors

relevant to the weighing of the opinions." 20 C.F.R. §§ 404.1527(f)(2)(ii) & 416.927(f)(2)(ii) (Nov. 12, 2010 to June 12, 2011). While the ALJ is not bound by the state agency physician's findings, the ALJ "may not ignore these opinions and must explain the weight given to the opinions" in the written decision. SSR 96-6p, 1996 WL 374180 at *2.

Here, the ALJ did not explicitly mention that she rejected Dr. Wahi's opinion regarding Claimant's ability to raise his arms overhead. However, the ALJ provided the factual basis for her finding that Claimant could engage in occasional overhead reaching. The ALJ explained that Claimant "admitted that he is able to raise his arm over his head although it occasionally 'catches.'" (Tr. at 20). During the administrative hearing, the ALJ specifically asked Claimant about his ability to raise his arms. Claimant advised the ALJ that he was able to raise his arm over his head, although he added that it "kind of like catches back in there," and it hurt when he raised it. (Tr. at 48). Claimant proceeded to demonstrate by raising his arm up over his head. (*Id.*). Thus, contrary to Dr. Wahi's range of motion measurements, Claimant showed the ALJ that he was capable of overhead reaching.

Furthermore, the ALJ expressly weighed the opinions of all of the consulting experts, with the exception of Ms. Gettman-Hughes, making it clear that she did not give any expert's opinion controlling or full weight. The ALJ gave Dr. Wahi's opinion on what Claimant was able to lift and carry only partial weight. As for Dr. Reddy and Dr. Franyutti, who were nonexamining agency consultants, the ALJ gave them partial weight, finding their opinions of Claimant's capabilities to be too demanding. (Tr. at 22). The ALJ gave little weight to the agency psychologists, who found no evidence of psychological issues, and little weight to the opinions of Dr. Bickett.

Therefore, considering that the reason is obvious for the ALJ's RFC finding regarding overhead reaching, the undersigned **FINDS** that the ALJ's failure to directly reject Dr. Wahi's opinion on this point is harmless error.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Plaintiff's motion for a remand, (ECF No. 11); **DENY** Defendant's Motion for Judgment on the Pleadings (ECF No. 14), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings to determine if Claimant meets the diagnostic description of mental retardation; that is, "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22;" and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District

Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  December 1, 2014.

Cheryl A. Eifert
United States Magistrate Judge